UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


| | | |
|---|---|---|
| ELIZABETH CLOSSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:07-cv-448-SEB-WGH |
| | ) | |
| ST. VINCENT HOSPITAL AND HEALTH | ) | |
| CARE CENTER, | ) | |
| | ) | |
| Defendant. | ) | |


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 39], filed on July 26, 2008, pursuant to Rule 56 of the Federal Rules of Civil

Procedure and Local Rule 56.1.[1]  Plaintiff, Elizabeth Clossey, brings this claim against

her former employer, Defendant, St. Vincent Hospital and Health Care Center ("St.

Vincent"), for its allegedly discriminatory actions toward her based on her disability, in

violation of the Americans with Disabilities Act, 42, U.S.C. § 12101 *et seq*. ("ADA").

---

[1] On October 17, 2008, Defendant filed a Motion to Strike the Affidavit of Wayne
Hamilton [Docket No. 51], contending that Ms. Clossey had: (1) made insufficient Rule 26(a)
disclosures; (2) failed to engage in reasonable inquiry into the subject matter of Mr. Hamilton's
testimony at the time initial disclosures were served as required by Rule 26(g); and (3) failed to
seasonably supplement her discovery responses in violation of Rule 26(e).  In the alternative, St.
Vincent requests that we reopen discovery to afford St. Vincent a full opportunity to conduct
discovery concerning the allegations made in Mr. Hamilton's affidavit and any other information
known by Mr. Hamilton.  Because, for the reasons detailed below, the testimony contained in
Mr. Hamilton's affidavit does not affect our analysis, we <u>DENY AS MOOT</u> Defendant's Motion
to Strike.

Ms. Clossey also alleges that St. Vincent retaliated against her for filing a worker's compensation claim in violation of Indiana law.  For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment.

## Factual Background

On April 20, 1992, Ms. Clossey was hired as a rounds cook by St. Vincent.  Ms. Clossey remained in that position until 1997, when she was promoted to the position of baker/entree cook.  Elizabeth Clossey Deposition ("Clossey Dep.") at 26-29.  Throughout her time working in these positions, she never received any discipline or negative performance reviews.  Id. at 28-29.  After approximately two and a half years as a baker/entree cook, Ms. Clossey was promoted to the position of cook/chill cook.[2]  As the only St. Vincent employee in the cook/chill position, Ms. Clossey was responsible for food preparation not only for St. Vincent, but also for three other hospitals in the St. Vincent Health, Inc., system.[3]  Id. at 28-30.  The position required Ms. Clossey to frequently lift ten to twenty pound bags, occasionally handle items weighing up to fifty pounds, and push and pull several hundred pounds of food on a cart daily.  Id. at 40-42.

In the fall of 2004, St. Vincent's food services department created the position of

---

[2] The term "cook/chill" refers to a process by which mass amounts of food are cooked and then rapidly chilled, which extends the shelf-life of the food and allows it to simply be reheated and served when necessary.  Clossey Dep. at 30-31.

[3] Defendant, St. Vincent, is the St. Vincent Indianapolis Hospital located on West 86th Street in Indianapolis, Indiana.  St. Vincent is a member of a larger Central Indiana Health System and separate corporate entity known as St. Vincent Health, Inc.  Sykes-Joseph Aff. ¶ 3.

Sous Chef.  The Sous Chef reported to directly to the Executive Chef, Paul Fallon, who reported to the Director of the Food Service Department, Guy Underdahl.  Id. at 34-35; Affidavit of Elizabeth Clossey ("Clossey Aff.") ¶ 9.  Ms. Clossey interviewed for the Sous Chef position and received the job in November 2004.  Clossey Dep. at 32-33.  As the day-shift Sous Chef, Ms. Clossey was responsible for, *inter alia*, overseeing the day-to-day operations in the food service department, ensuring that all of the cooking was completed, and supervising and training approximately ninety employees.  Clossey Aff. ¶¶ 10, 12.  Ms. Clossey contends that, as compared to the duties of the cook/chill position, the Sous Chef's duties were more administrative in nature.[4]  She had only limited cooking duties as Sous Chef and, according to Ms. Clossey, unlike the cook/chill position, the position of Sous Chef did not require pushing, pulling, lifting, or repetitive arm motions. Id. ¶ 5.

**The Progression of Plaintiff's Injury and Resulting Work Restrictions**

In the summer of 2004, while she was still working in the cook/chill position, Ms. Clossey began experiencing pain in her arms and elbows associated with activities such as pushing, pulling, and lifting.  According to Ms. Clossey, at that time, she mentioned the pain to her supervisor, Paul Fallon, but she did not request any accommodations or

---

[4] When Ms. Clossey began working as Sous Chef, she retained some of her cook/chill duties which occupied, on average, three to four hours of her ten-hour shift.  However, by January 5, 2005, Ms. Clossey was involved in the process of training an employee to take over her cook/chill duties.  Clossey Aff. ¶ 11.

change in duties.  Clossey Aff. ¶ 13.  By January 2005, Ms. Clossey's pain had become continuous, increasing proportionally in relation to the weight of the objects she had to handle or lift.  St. Vincent contends that it was not until this point that Ms. Clossey first reported her pain to anyone at St. Vincent, when on January 5, 2005, she informed one of her supervisors, Sherry Wermer.  At the direction of Ms. Wermer, Ms. Clossey visited St. Vincent Occupational Health for an evaluation that same day.  Clossey Dep. at 46-47. Based on that evaluation, Ms. Clossey was diagnosed with bilateral medial epicondylitis, more commonly known as "golfer's elbow."  Id. at 54.  Ms. Clossey's injury was reported to worker's compensation officials at St. Vincent and she was placed on limited duty with restrictions that included "no lifting over two to five pounds; no pushing or pulling; and limit[ing] any repetitive use of the hands or wrists."[5]  Clossey Aff. ¶ 14; Exh. 7 (1/5/05 Work Limitations).

---

[5] Under St. Vincent's Limited Duty Program, an employee is eligible for limited duty assignments for up to six months, or until she reaches Maximum Medical Improvement as determined by her worker's compensation physician, or until her physician clears her to return to work without limitations, whichever occurs first.  After six months, if the employee is still unable to return to her regular duties, she is no longer guaranteed a return to her original position.  In that event, the employee is placed in St. Vincent's Extended Rehabilitation Program for up to an additional six months, or until she reaches Maximum Medical Improvement.  During Extended Rehabilitation, the employee continues to receive limited duty assignments, but is also exposed to different types of work and other areas of the hospital in hopes that the employee will gain skills and experience to aid her in finding a new position, either within or outside of St. Vincent.  Although Ms. Clossey contends that she never read the Limited Duty Policy, St. Vincent claims that Cindy Haskell, the Worker's Compensation Coordinator/Case Manager, informed her that she would have six months of limited duty within which time period she needed to return to her original duties; after that period, she could then apply for other open positions.  See Exh. 8 (Limited Duty Program); see also Affidavit of Kim Sykes-Joseph ¶¶ 13-16.

Cindy Haskell, a Worker's Compensation Coordinator/Case Manager, was assigned to administer Ms. Clossey's limited duty and reported the information regarding Ms. Clossey's work restrictions to Ms. Clossey's supervisors, Mr. Fallon and Mr. Underdahl.  According to St. Vincent, Mr. Fallon and Mr. Underdahl attempted to accommodate her limitations by relieving her of any cook/chill duties that she continued to perform and by having other employees perform the lifting tasks for objects over two to five pounds as well as pushing and pulling the food carts.

Ms. Clossey contends otherwise.  She alleges that, because the duties of the Sous Chef were largely administrative, her restrictions should have had no impact on her ability to perform the duties of that position.  However, she maintains that, almost immediately after she was put on limited duty, Mr. Fallon began requiring her to perform various tasks requiring heavy lifting that were not within her job description and which violated her restrictions.  Clossey Aff. ¶¶ 15-16.  According to Ms. Clossey, she remembered being told to "go ahead and lift some things that [she] wasn't supposed to lift like vegetables and stuff because they didn't have anybody else."  Clossey Dep. at 69.

Despite the fact that she was unable to perform the lifting, Ms. Clossey contends that she was nevertheless capable of fulfilling her duties as Sous Chef because she had the authority to instruct any of the employees who reported to her to do any activity that she deemed necessary, including lifting.[6]  She claims that in January 2005, shortly after Mr.

---

[6] According to Ms. Clossey, on any given day, she had at least three porters, two
(continued...)

Fallon instructed her to perform tasks that violated her restrictions, she told him that, while she could not perform the lifting that he had requested, she could have one of the employees whom she supervised complete the task.  Clossey Aff. ¶ 16.

According to Ms. Clossey, it was a regular practice within St. Vincent's food service department to give meal tickets to employees as a reward for performing tasks outside of their normal duties and that she, Mr. Fallon, and Wayne Hamilton, the night-shift Sous Chef, had all previously done so on numerous occasions.  Id. ¶¶ 18-19.  Ms. Clossey asserts that she could have remained in the Sous Chef position despite her limitations if she had been allowed to utilize the same method for employees who completed lifting tasks for her.

**Plaintiff's Transfer From the Sous Chef Position**

According to St. Vincent, Ms. Clossey never reported to her supervisors or anyone else at St. Vincent that she was being asked to perform duties outside of her physical limitations prior to February 2005, when she informed Occupational Health that her pain was not improving and that she was having difficulty complying with her work limitations.[7]  Following that report, Ms. Clossey was removed from her position as Sous

---

[6](...continued)
stockroom employees, and one overflow purchaser whom she could direct to lift anything that exceeded the limits of her restrictions.  Clossey Aff. ¶ 16.

[7] Ms. Clossey denies that she was having difficulty complying with her work restrictions. She contends that Mr. Fallon was just ignoring those restrictions.  Pl.'s Resp. at 4.

Chef and placed in a position in the cafeteria where she was responsible for a wide range of duties, including performing setup tasks from breakfast to lunch, "policing" the cafeteria, and running the cash register. However, working the cash register required repetitive use of her hands, which also violated Ms. Clossey's work restrictions. Clossey Aff. ¶ 22. Thus, approximately two to three weeks after being transferred to the cafeteria, Ms. Clossey was transferred a second time to a position in the radiology, or x-ray, department.[8]

In the radiology department, Ms. Clossey's duties consisted of escorting patients to and from the waiting room for x-ray procedures. Approximately a month and a half after her work began in the radiology department, Ms. Clossey started performing additional duties at the front desk, which included greeting patients, charging patients through the computer, answering the phone, preparing faxes, as well as filing, printing, and retrieving x-ray films. Clossey Dep. at 78-81. Ms. Clossey remained in the radiology department for approximately seven months, at which point Ms. Haskell transferred her to the Diabetic Center, where she was responsible for answering the phone, making charts, and making telephone calls. A month and a half later, Ms. Clossey was moved from the Diabetic Center to Hospice. However, Ms. Clossey remained in Hospice for only twenty minutes because she could not handle the smells in that department. Ms. Clossey was then transferred to the Neuroscience Institute where she spent most of her time working

---

[8] Once Ms. Clossey was moved from the cafeteria to radiology, she was no longer supervised by Mr. Underdahl and had no further contact with him. Clossey Dep. at 109.

on the computer performing database work and assisting the nurses and doctors with various tasks.  She continued to work in the Neuroscience Institute until December 13, 2005.  Id. at 82-85.

**The Parties' Dispute Over the Sous Chef's Job Description**

At some point after she was removed from the Sous Chef position, but prior to May 2005, Ms. Clossey expressed to Ms. Haskell that she would like to return to the day-shift Sous Chef position because she believed that she could perform all the functions of that job.  Clossey Aff. ¶ 23.  However, Mr. Underdahl indicated that putting up stock in the stock room (which Ms. Clossey could not do with her restrictions) was a part of the Sous Chef's job description.  Clossey Dep. at 112.  Additionally, St. Vincent required a release from a doctor indicating that she could perform the duties of the position before she could return and Ms. Clossey never provided such a release.[9]  As a result, in June 2005, St. Vincent hired a new day-shift Sous Chef to replace Ms. Clossey.[10]  Clossey Aff. ¶ 28.

---

[9] According to Ms. Clossey, on June 28, 2005, her physician, James J. Creighton, M.D., provided a release to St. Vincent, stating that she could perform the Sous Chef duties "if the work height and weight can be adjusted and the reaching activity can be limited."  Exh. 9 (6/28/05 Physician Letter).  Ms. Clossey contends that the concerns to which her physician referred were not actual duties of the job, however, but fictitious additions made by Mr. Underdahl.  Clossey Dep. at 111.

[10] Ms. Clossey contends that this was prior to any written change in the position's physical requirements and prior to the expiration of the mandatory six month window during which positions are supposed to remain open for Limited Duty Program participants, such as Ms. Clossey.  Clossey Aff. ¶ 28.

Ms. Clossey contends that in fact there was no such requirement (of putting up stock) for the Sous Chef position.  Id. ¶ 7.  She alleges that after replacing her, Mr. Fallon and Mr. Underdahl caused the physical requirements for the position to be revised in order to prevent her from returning to the job.  Ms. Clossey claims that Mr. Fallon and Mr. Underdahl enlisted the night-shift Sous Chef, Wayne Hamilton, to help them get the physical requirements changed.  Shortly after Ms. Clossey was hired as the day-shift Sous Chef in November 2004 (and, according to Ms. Clossey, after she had first mentioned to Mr. Fallon that she was experiencing pain), St. Vincent hired Mr. Hamilton as the night-shift Sous Chef.  In his affidavit, Mr. Hamilton testified that, when he was hired, Mr. Fallon told him that he [Mr. Fallon] "wanted to get rid of Ms. Clossey."  Affidavit of Wayne Hamilton ("Hamilton Aff.") ¶ 3.  According to Mr. Hamilton, Mr. Fallon instructed him to "make [Ms. Clossey] so unhappy that she would not want to be there" and to "do whatever it took to drive her away."  Id.

On June 13, 2005, St. Vincent Occupational Therapy was scheduled to conduct an on-site analysis of the Sous Chef position to determine whether the job description required updating.  Mr. Hamilton testified that, on the day before the inspection was to take place, Mr. Underdahl approached him and told him to "make it appear that the job is more difficult than it is so that Ms. Clossey cannot come back."  Id. ¶ 8.  In order to create that appearance, Mr. Underdahl allegedly instructed Mr. Hamilton to "put up stock, pull 50 lbs. meat carts and to do other things that were not a part of the job."  Id. ¶ 9.  According to Mr. Hamilton, he did as he was told by Mr. Underdahl and, as a result,

9

Occupational Therapy recommended modifications to the job description of the Sous
Chef to reflect the increased physical requirements.  Id.

On June 28, 2005, Ms. Clossey's physician, James J. Creighton, M.D., notified St.
Vincent by letter that Ms. Clossey could perform the revised duties of the Sous Chef "if
the work height and weight can be adjusted and the reaching activity can be limited."
Exh. 9 (6/28/05 Physician Letter).  St. Vincent contends that Ms. Haskell discussed
possible accommodations with Ms. Clossey's physician, but that no such
accommodations were able to be implemented.  According to Ms. Clossey, she never
received a copy of the revised physical requirements for the Sous Chef position, nor was
she asked if there was any reasonable accommodation which would allow her to perform
the functions of the job.  Clossey Aff. ¶¶ 25-26.  Additionally, she maintains that her
physician's opinion only pertained to the allegedly improperly revised requirements, not
to the original requirements, which she could perform.  Clossey Dep. at 111.


**Plaintiff's Applications for Other Positions and Subsequent Termination**

On December 13, 2005, Ms. Clossey was determined to have reached Maximum
Medical Improvement, which was later explained as a Permanent Partial Impairment
Rating equaling twelve percent.  See Exh. 10 (12/20/05 Physician's Letter); Exh. 11
(2/10/06 Physician Letter).  As a result of that determination, Ms. Clossey was placed on
the following permanent restrictions: (1) may not lift over twenty-five pounds; (2) may
not lift greater than twenty-five pounds floor to waist and horizontal; (3) no lift greater

10

than five pounds waist to overhead constantly; and (4) may lift up to twenty pounds floor to waist on occasional basis.  See Exh. 12 (12/13/05 Work Limitations).  Pursuant to St. Vincent policies, once Ms. Clossey was deemed to have reached Maximum Medical Improvement, she was no longer eligible for assignments in the Extended Rehabilitation Program.[11]  Therefore, she was placed on a six-month unpaid leave of absence and instructed to keep applying for jobs because if she did not find new employment elsewhere in the St. Vincent system within the six-month period, she would be "kicked out."  Clossey Dep. at 170.

According to Kim Sykes-Joseph, a Human Resources Business Consultant with St. Vincent, Ms. Clossey submitted twenty-two applications between September 5, 2005, and July 16, 2006; nine were for positions within St. Vincent itself, and the remaining applications were for positions with different hospitals or other entities within the St. Vincent Health, Inc., system.[12]  Affidavit of Kim Sykes-Joseph ("Sykes-Joseph Aff.") ¶¶ 7, 9.  All the positions for which St. Vincent maintained a record indicated that Ms. Clossey applied for only administrative or clerical positions.  However, Ms. Clossey contends that she also applied for open positions in the food service department.

---

[11] Under the terms of the plan, after six months on St. Vincent's Limited Duty Program, Ms. Clossey had been moved to the Extended Rehabilitation Program.

[12] Debora Townsend, who worked in St. Vincent's human resources department, assisted Ms. Clossey in her job search from October 2005 to December 2005.  According to St. Vincent, during that time Ms. Townsend informed Ms. Clossey of certain open positions which required her (Ms. Clossey) to obtain a certain score on a typing test before she would be eligible, but Ms. Clossey never took the test.

According to St. Vincent, Ms. Clossey did not satisfy the required qualifications for four of the nine positions with St. Vincent for which she applied and did not have the required prerequisites for six of the remaining thirteen positions for which she applied within the St. Vincent Health, Inc., system.[13]  Id. ¶ 11.

On June 15, 2006, having failed to obtain any position at St. Vincent, Ms. Clossey was terminated.  Exh. 18 (Termination Letter).  Following her termination, Ms. Clossey applied for and was awarded Long-Term Disability Benefits, which, as of the time of her April 29, 2008, deposition, she continued to receive.  Clossey Dep. at 13, 172.

**The Instant Litigation**

On June 20, 2006, Ms. Clossey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that St. Vincent discriminated against her based on her sex, age, and disability, when it terminated her and failed to place her in any other position for which she had applied.  On April 11, 2007, after receiving her "right to sue letter" from the EEOC, Ms. Clossey filed the Complaint in this action, alleging claims of disability discrimination and wrongful termination.

---

[13] Ms. Sykes-Joseph testified in her affidavit that "St. Vincent's consistent and honestly applied policy and practice when hiring an individual for a position is to hire the most qualified job applicant, rather than simply hiring the first applicant."  Sykes-Joseph Aff. ¶ 10.

<u>**Legal Analysis**</u>

**I.      Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u>, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  <u>Id.</u> at 325; <u>Doe v. R.R. Donnelley & Sons, Co.</u>,

42 F.3d 439, 443 (7th Cir. 1994).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion.  Anderson, 477 U.S. at 247-52.  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made

14

clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Statute of Limitations

In both her complaint and her EEOC charge of discrimination, Ms. Clossey alleged that: (1) she became disabled on December 13, 2005; (2) the earliest date on which discrimination took place was on December 16, 2005; and (3) St. Vincent discriminated against her and failed to accommodate her when it did not hire her in any one of the vacant positions for which she applied.  However, in her responsive briefing on this motion, Ms. Clossey appears to have abandoned this discrimination theory and instead now contends that her removal from the Sous Chef position in February 2005, approximately eleven months earlier than the events described in her EEOC charge and complaint, was the result of disparate treatment and amounted to a failure to accommodate.

St. Vincent contends that Ms. Clossey's new allegations of discrimination, mentioned for the first time in her response to St. Vincent's motion for summary judgment, are untimely.[14]  In Indiana, in order to pursue a claim of discrimination under

---

[14] Although these new theories were not raised by Ms. Clossey until she filed her
(continued...)

the employment provisions of the ADA, a plaintiff must file a charge of discrimination

with the EEOC within 300 days of the alleged discriminatory act.  Kaley v. Icon Intern.

Inc., 2001 WL 1781898, at *4 (S.D. Ind. Dec. 4, 2001) (Hamilton, J.).  Here, Ms. Clossey

filed her EEOC charge on June 20, 2006.  Thus, the statute of limitations presumptively

bars Ms. Clossey from seeking relief for any alleged disability discrimination based on

discrete acts occurring before August 23, 2005.

     In her response brief, Ms. Clossey contends that St. Vincent violated her rights

under the ADA by subjecting her to disparate treatment and failing to accommodate her

disability in February 2005 when she was removed from the Sous Chef position and

transferred to other open positions in the hospital.[15]  Even if we assume that all of Ms.

---

[14](...continued)
responsive briefing on this motion, St. Vincent apparently anticipated that such claims might be
raised when it noted in its initial brief filed in support of its motion for summary judgment that Ms.
Clossey's complaint does not make mention of any events that allegedly transpired prior to
December 13, 2005, and that, based on the filing date of her EEOC charge, any claims Ms.
Clossey might try to make related to alleged discriminatory acts that transpired prior to August
23, 2005, would be untimely.  Ms. Clossey first raised these new theories of discrimination in
her response brief and made no mention of the timeliness issue, nor has she requested leave to
file a surreply in order to address the reiterated and more fully developed timeliness argument set
forth in St. Vincent's reply brief.

[15] In support of these claims, Ms. Clossey relies solely upon the following factual
allegations: (1) in January 2005, her supervisors assigned her lifting tasks in violation of her
restrictions and did not assign similar tasks to Mr. Hamilton, who had the same position and the
same supervisors; (2) in February 2005, St. Vincent transferred Ms. Clossey from the Sous Chef
position to a position in the cafeteria which required her to perform tasks that violated her
restrictions; (3) in May 2005, before the six-month period had expired within which St. Vincent
was required to keep the position open for Ms. Clossey under its limited duty program
guidelines, St. Vincent hired a replacement for Ms. Clossey in the Sous Chef position; (4) in
June 2005, St. Vincent reevaluated and increased the physical requirements of the Sous Chef
position; and (5) when Mr. Hamilton was hired in 2004, Ms. Clossey's supervisors allegedly told
(continued...)

Clossey's allegations are true, as we are required to do at this stage of the proceeding, the discriminatory acts that she contends support her new theories all occurred before August 23, 2005, and thus, fall outside of the requisite 300-day time period.  It is undisputed that: (1) Ms. Clossey was placed on work restrictions on January 5, 2005; (2) she was transferred out of the Sous Chef position in February 2005; (3) she was replaced in the Sous Chef position in May 2005; and (4) under St. Vincent's limited duty policy, she was no longer entitled to return to the Sous Chef position by August 5, 2005.[16]  Each of these events was a discrete act of which Ms. Clossey was aware at the time.  Despite this knowledge, she failed to file a charge with the EEOC within 300 days thereafter.  Consequently, whatever Ms. Clossey's claims may have been against St. Vincent based on these events, they are untimely.

Accordingly, we <u>GRANT</u> St. Vincent's Motion for Summary Judgment on Ms. Clossey's claims that St. Vincent violated her ADA rights when it: (1) failed to reasonably accommodate her when it transferred her out of the Sous Chef position in February 2005, after receiving her work restrictions; and (2) subjected her to disparate

---

[15](...continued)
him they wanted to get rid of her and, in June 2005, Ms. Clossey's supervisors allegedly told Mr. Hamilton to make the Sous Chef position look harder than it actually was so that the physical requirements for the job would be changed.

[16] There is a dispute regarding when Ms. Clossey was no longer entitled to return to the Sous Chef position under St. Vincent's limited duty program.  St. Vincent contends that Ms. Clossey was actually no longer entitled to return to the position as of July 5, 2005, but for purposes of this motion, we accept Ms. Clossey's contention that she was entitled to return until August 5, 2005.

treatment or intentionally discriminated against her when it removed her from the Sous Chef position in February 2005.  Thus, we shall address only her timely asserted claims, to wit, that: (1) St. Vincent failed to accommodate her disability and discriminated against her in violation of the ADA, when it did not place her in any of the open positions for which she applied after December 16, 2005; and (2) St. Vincent terminated her in retaliation for her filing a worker's compensation claim, in violation of Indiana law.

### III.    ADA Claims

Under the ADA, discrimination is prohibited "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a); Furnish v. SVI Sys., Inc., 270 F.3d 445, 448 (7th Cir. 2001).  Additionally, the Act provides that an employer engages in disability discrimination by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); Basith v. Cook County, 241 F.3d 919 (7th Cir. 2001).   It is the plaintiff's burden to prove that she is a "qualified individual" under the ADA, to wit, that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires."  Weiler v. Household Fin. Corp, 101 F.3d 519, 524 (7th Cir. 1996) (quoting 42 U.S.C. § 12111(8)).

In her complaint, Ms. Clossey alleges that, in violation of the ADA, St. Vincent discriminated against her and failed to accommodate her when it failed to hire her for any of the open positions for which she applied after becoming disabled in December 2005. St. Vincent contends that Ms. Clossey has failed to present evidence to suggest that she was discriminated against, or that St. Vincent failed to accommodate her, by not hiring her into open positions after her limited duty was exhausted, pointing in particular to the fact that it was St. Vincent's practice and policy to hire the best applicant for any specific job, rather than the first qualified applicant, and that those selected for vacant positions for which Ms. Clossey was qualified were more qualified or experienced.  See E.E.O.C. v. Humiston-Kneeling, Inc., 227 F.3d 1024, 1029 (7th Cir. 2000) ("[T]he ADA does not require an employer to reassign a disabled employee to a job for which there is a better applicant, provided it's the employer's consistent and honest policy to hire the best applicant for the particular job in question rather than the first qualified applicant").

Rather than responding to St. Vincent's argument, Ms. Clossey appears to have abandoned her claims based upon St. Vincent's failure to hire her for any of the vacant positions for which she applied, as she did not even mention them, much less develop them in her responsive briefing on this motion.  By entirely neglecting to respond to St. Vincent's argument that she failed to present evidence to establish an ADA claim based on St. Vincent's alleged failure to hire her for any of the vacant positions for which she applied, Ms. Clossey has waived any such claim she may have had.  Watkins v. Henderson, 2001 WL 219807, at *17 (S.D. Ind. March 5, 2001) (Barker, J.) (citing

Teumer v. General Motors Corp., 34 F.3d 542, 545-46 (7th Cir. 1994)).  Accordingly, we

GRANT Defendant's Motion for Summary Judgment on Ms. Clossey's claims that St.

Vincent discriminated against her and failed to accommodate her by not hiring her into

any of the open positions for which she applied.


**III.    Retaliatory Discharge**

Ms. Clossey also contends that she was terminated in retaliation for pursuing a

worker's compensation claim, in violation of Indiana law.  Employment in Indiana is

generally at-will, meaning that "the employer may discharge the employee at any time

with or without cause."  Purdy v. Wright Tree Service, Inc., 835 N.E.2d 209, 212 (Ind. Ct.

App. 2005) (citing Coutee v. Lafayette Neighborhood Housing Services, Inc., 792 N.E.2d

907, 911 (Ind. Ct. App. 2003), trans. denied, 812 N.E.2d 794 (Ind. 2004)).  However,

Indiana recognizes a cause of action for employees discharged in retaliation for filing a

worker's compensation claim.  Hudson v. Wal-Mart Stores, Inc., 412 F.3d 781, 785 (7th

Cir. 2005) (citing Frampton v. Central Indiana Gas Co., 297 N.E.2d 425 (1973)).

To succeed on a claim of retaliatory discharge, the plaintiff must establish a causal

connection between her termination and the filing of her worker's compensation claim.

Caskey v. Colgate-Palmolive Co., 535 F.3d 585, 594 (7th Cir. 2008).  Ms. Clossey fails to

establish such a sufficient causal connection here.  Because she concedes that she does

not have direct evidence of retaliatory intent, to prove causation she must rely on indirect

evidence, "such as proximity in time or evidence that the employer's asserted lawful

reason for discharge is a pretext." Powdertech, Inc. v. Joganic, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002) (citing Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 369 (Ind. Ct. App. 1999)).   Ms. Clossey relies heavily on the timing between when she first had contact with personnel from worker's compensation in January 2005 (when she was initially placed on work limitations and first dealt with Ms. Haskell, the Worker's Compensation Coordinator) and one month later when she was transferred from the Sous Chef position to the cafeteria in February 2005.

However, following her initial transfer, she performed limited duty assignments in various departments at St. Vincent until December 15, 2005, when she was placed on the six-month unpaid leave of absence.  Ms. Clossey is unable to pinpoint the exact date on which she actually filed her worker's compensation claim, but testified in her deposition that it was sometime after December 15, 2005.  She was officially terminated on June 15, 2006, when she failed to find another position before the end of her leave of absence.[17] Thus, Ms. Clossey was terminated only after St. Vincent provided her with approximately eleven months of limited duty assignments and a six month leave of absence during which she was to apply for other positions.  We find nothing suspicious about such timing that would support Ms. Clossey's contention that she was terminated in retaliation for filing a worker's compensation claim.

---

[17] Ms. Clossey testified in her deposition that, at the time, she believed that she was being terminated on December 15, 2005, before she contends that she filed her worker's compensation claim.

In addition to her argument regarding the time sequence, Ms. Clossey contends that St. Vincent's reason for terminating her was merely a pretext for discrimination, which she claims provides a causal link between the filing of her worker's compensation claim and her termination.  According to St. Vincent, Ms. Clossey was terminated when she had exhausted her six-month leave of absence – the maximum length of time St. Vincent employees are allowed to be on leave – and had not yet found employment elsewhere in the hospital.  In arguing that St. Vincent's reason for her discharge is merely pretext, Ms. Clossey relies heavily upon the allegedly discriminatory actions of her supervisors, Mr. Fallon and Mr. Underdahl, to wit, their decision to transfer her out of the Sous Chef position in February 2005 and their alleged plot in June 2005 to increase the physical requirements of the position so that she would be unable to return.

However, even if true, these allegations about Mr. Fallon and Mr. Underdahl do not support a conclusion that her termination itself was retaliatory because she has not sufficiently demonstrated the relationship between those alleged acts and her eventual termination, which occurred approximately one year later.  The evidence adduced shows that once Ms. Clossey was moved out of the food service department and into radiology in late February or early March 2005, she had no further contact with Mr. Underdahl. Instead, Ms. Clossey testified that, following her transfer to radiology, she dealt with Debora Townsend and Cindy Haskell with regard to her work limitations and job applications.  Further, the record shows that Ms. Townsend was the individual who informed Ms. Clossey that she was being placed on the six-month unpaid leave of

22

absence and that Felicia Jackson, a St. Vincent benefit specialist, informed Ms. Clossey, by letter dated July 18, 2006, that her employment had been terminated effective June 15, 2006.  Therefore, we find that Ms. Clossey has failed to demonstrate that St. Vincent's proffered reason for her discharge was a pretext for discrimination.

For the foregoing reasons, we GRANT St. Vincent's Motion for Summary Judgment on Ms. Clossey's retaliatory termination claim.

**IV.   Conclusion**

For all the reasons detailed above, we GRANT Defendant's Motion for Summary Judgment.  Additionally, we DENY AS MOOT Defendant's Motion to Strike.  Final judgment will be entered accordingly.

IT IS SO ORDERED.

Date:  _____03/31/2009_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

23

Copies to:

Kenneth E. Lauter
HASKIN LAUTER  & LARUE
klauter@hlllaw.com

Richard W. McMinn
HASKIN LAUTER  & LARUE
rmcminn@hlllaw.com

John Patrick Ryan
HALL RENDER KILLIAN HEATH & LYMAN
jpryan@hallrender.com

Craig M. Williams
HALL RENDER KILLIAN HEATH & LYMAN
cwilliams@HallRender.com